UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MIGUEL ROMAN, | * | |
| Petitioner, | * | |
| v. | * | Civil Action No. 16-cv-10116-ADB |
| LISA RYAN, | * | |
| Respondent. | * | |

**MEMORANDUM AND ORDER**
**ON PETITION FOR A WRIT OF HABEAS CORPUS**

BURROUGHS, D.J.

On December 29, 2011, Petitioner Miguel Roman was convicted of deliberately premeditated murder and possession of a class B substance. Currently pending before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which Petitioner asserts that the evidence was insufficient to sustain his murder conviction. [ECF No. 1]. For the reasons stated herein, the petition for a writ of habeas corpus is denied.

**I.   BACKGROUND**

The Massachusetts Supreme Judicial Court ("SJC") provided the following account of the facts of the case as the jury could have found them.[1]

> Shortly before midnight on January 28, 2010, Angel Gonzalez (Angel) called the [Petitioner] on his cellular telephone to arrange a purchase of cocaine. Angel and Luis Soto then drove to a night club in Holyoke where [Petitioner] sold them cocaine. They traveled in a grey four-door 2006 Nissan Altima owned by Soto's girl friend. They then drove to a bar in Holyoke, ingesting the cocaine en route.

---

[1] In a federal habeas case, the state court's "factual findings are presumed to be correct, and they can be overcome only by clear and convincing evidence." Foxworth v. St. Amand, 570 F.3d 414, 424 (1st Cir. 2009). This presumption applies to determinations made by "both state trial and appellate courts." Gaskins v. Duval, 640 F.3d 443, 452 (1st Cir. 2011) (citing Clements v. Clarke, 592 F.3d 45, 47 (1st Cir. 2010)).

At about 12:56 a.m. on January 29, Angel's mother called Angel on his cellular telephone and told him that the victim was at the Holyoke Medical Center and needed a ride. Soto, Angel, and Angel's brother Felipe left the bar in the Altima. They drove to the hospital and went inside to get the victim. The four men then returned to the bar. After about one hour they all left together. Angel called [Petitioner] on his cellular telephone to arrange another purchase of cocaine. Angel's cellular telephone records showed three calls that connected with the [Petitioner's] cellular telephone between 1:30 a.m. and 1:52 a.m. They drove to the night club to meet [Petitioner]. Angel and the victim got out of the car and went inside the club. When they returned, [Petitioner] was with them and the three men entered the Altima.

Soto was driving; Angel was in the front passenger seat; [Petitioner] sat behind Soto; Felipe was behind Angel; and the victim sat between [Petitioner] and Felipe. [Petitioner] told Soto to drive. They proceeded down High Street. [Petitioner] directed Soto to turn right onto Essex Street. [Petitioner] pulled out a handgun and shot the victim twice in the left rear side of his head. Soto stopped the car and shifted into the "park" position. Felipe got out of the car and ran toward High Street. Angel got out of the car and stood nearby for a short time before running toward High Street. Soto was the third to get out of the car. He hesitated because he was concerned about abandoning his girl friend's car, but then he left and ran toward High Street.

[Petitioner] was the last person to get out of the Altima. He walked around the rear of the car, opened the rear passenger's side door and fired a third shot into the victim's right temple. He then got into the driver's seat of the Altima and sped off. [Petitioner] turned onto Newton Street where he stopped and dumped the victim's body in the road. In the meantime, Felipe, Angel, and Soto made their way to Sam's Food, a nearby store on High Street. [Petitioner] called Angel's cellular telephone at 2:04:07 a.m. The call connected for forty-four seconds. The Altima, driven by [Petitioner], arrived at Sam's Food store shortly thereafter. [Petitioner] left the car there, and left the scene himself. The others then drove away in the Altima. Soto turned himself in to police the next day.

Commonwealth v. Roman, 18 N.E.3d 1069, 1071 (Mass. 2014).

Following a jury trial in the Hampden County Superior Court, Petitioner was found guilty of deliberately premeditated murder and possession of a class B substance (cocaine). [ECF No. 1 at 1]. He was sentenced to life imprisonment for the murder conviction and to a concurrent one-year House of Correction sentence for the possession conviction. Id.

Petitioner appealed his convictions on the following grounds: (1) insufficiency of the evidence; (2) the denial of his right to a speedy trial; (3) prosecutorial misconduct in the delayed production of discovery; (4) the trial court's failure to declare a mistrial due to jury tampering by the victim's family; and (5) an erroneous jury instruction regarding the testimony of a cooperating witness. Roman, 18 N.E.3d at 1071. He also requested that the SJC exercise its power under Mass. Gen. Laws ch. 278, § 33E to reverse his convictions and either order a new trial or reduce the conviction of murder to a lesser degree. Id. On November 4, 2014, the SJC affirmed the convictions and declined to exercise its authority under § 33E. Id. On January 26, 2016, Petitioner filed this petition for a writ of habeas corpus, asserting a single claim that the SJC misapplied the sufficiency of the evidence standard and made unreasonable factual determinations concerning the murder conviction. [ECF No. 1].

## II. DISCUSSION

### A. Applicable Law

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") permits federal courts to grant habeas corpus relief on a claim "adjudicated on the merits in State court proceedings" if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The First Circuit has further explained the § 2254(d)(1) standard as follows:

> An adjudication will be contrary to clearly established law if the state court applies a rule that contradicts the governing law set forth by the Supreme Court or confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent. On the

3

> other hand, a state court adjudication constitutes an unreasonable application if the state court identifies the correct governing legal principle from the Supreme Court's then-current decisions but unreasonably applies that principle to the facts of the prisoner's case.

Hensley v. Roden, 755 F.3d 724, 731 (1st Cir. 2014) (internal citations and quotations omitted). Here, Petitioner only claims under § 2254(d)(1) that the SJC unreasonably applied the governing law from Supreme Court precedent. An unreasonable application of clearly established federal law requires "some increment of incorrectness beyond error." Norton v. Spencer, 351 F.3d 1, 8 (1st Cir. 2003) (internal quotations omitted). The state court decision must be "'objectively unreasonable,' not merely wrong." White v. Woodall, 572 U.S. 415, 419 (2014) (quoting Lockyer v. Andrade, 538 U.S. 63, 75−76 (2003)); see also Harrington v. Richter, 562 U.S. 86, 102 (2011) ("[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."). Petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

Under § 2254(d)(2), the AEDPA permits "relief from a state court judgment if that judgment is based on an unreasonable determination of the facts." Rashad v. Walsh, 300 F.3d 27, 35 (1st Cir. 2002). A state court judgment is based on an unreasonable determination of the facts if the decision is "objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). The federal habeas court may not characterize the state court factual determinations as unreasonable "merely because [it] would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010). The state court's factual findings "are entitled to a presumption of correctness that can be rebutted only by clear and convincing evidence to the contrary." Rashad, 300 F.3d at 35 (quoting Ouber v. Guarino, 293 F.3d 19, 27 (1st Cir. 2002)). Thus, Petitioner's burden in this regard is

4

"heavy," and if it is not met, "a federal habeas court must credit the state court's findings of fact—and that remains true when those findings are made by a state appellate court as well as when they are made by a state trial court." Id.

Here, the parties agree that the petition rests solely on a challenge to the sufficiency of the evidence as governed by the Supreme Court's decision in Jackson v. Virginia, 443 U.S. 307 (1979).[2] Jackson held that the constitutional right to due process guarantees "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." 443 U.S. at 316. "More succinctly, the relevant test . . . from Jackson is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" O'Laughlin v. O'Brien, 568 F.3d 287, 299 (1st Cir. 2009) (quoting Jackson, 443 U.S. at 319). "In evaluating the evidence, the reviewing court must exercise 'some degree of intellectual rigor,' and not credit 'evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'" Akara v. Ryan, 270 F. Supp. 3d 423, 431 (D. Mass. 2017) (quoting Leftwich v. Maloney, 532 F.3d 20, 23 (1st Cir. 2008)). The federal habeas court "faced with a record . . . that supports conflicting inferences must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that

---

[2] Here, the SJC invoked Commonwealth v. Latimore, 393 N.E.2d 370, 375 (Mass. 1979) which adopted Jackson as the sufficiency of the evidence standard in Massachusetts. See Leftwich v. Maloney, 532 F.3d 20, 24 (1st Cir. 2008) ("Because the Latimore court adopted the governing federal constitutional standard as the Massachusetts standard for sufficiency of the evidence challenges, . . . we can securely reason that in scouring the record for Latimore error and finding none the SJC effectively answered the federal constitutional question."). "That the SJC applied Latimore rather than Jackson does not diminish its claim to deference under AEDPA, . . . as 'the Latimore test . . . is functionally identical to the Jackson . . . standard.'" Linton v. Saba, 812 F.3d 112, 123−24 (1st Cir. 2016) (quoting Logan v. Gelb, 790 F.3d 65, 71 (1st Cir. 2015)).

5

resolution." Linton v. Saba, 812 F.3d 112, 123 (1st Cir. 2016) (quoting Jackson, 443 U.S. at 326); see Housen v. Gelb, 744 F.3d 221, 226 (1st Cir. 2014) ("[A] habeas court may not freely reweigh competing inferences but must accept those reasonable inferences that are most compatible with the jury's verdict." (internal quotation marks and citation omitted)).

In the habeas context, "Jackson claims face a high bar." Carrington v. Spencer, No. 14-cv-13102-ADB, 2015 WL 3874872, at *7 (D. Mass. June 23, 2015) (quoting Coleman v. Johnson, 566 U.S. 650, 651 (2012)). See Hurtado v. Tucker, 245 F.3d 7, 19–20 (1st Cir. 2001) ("[A]s a general rule, federal courts should be particularly cautious about issuing habeas, on grounds of the objective unreasonableness of a state court's conclusion that the evidence is sufficient . . . ."). The question for the reviewing court is not whether the state court was correct in finding the evidence supported the conviction beyond a reasonable doubt, "but rather whether [the state court's] judgment amounted to a decision that unreasonably applied Jackson." Pimental v. Spencer, 305 Fed. App'x. 672, 2009 WL 57109, at *1 (1st Cir. Jan. 9, 2009). "[A] state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was 'objectively unreasonable.'" Linton, 812 F.3d at 123 (quoting Parker v. Matthews, 567 U.S. 37, 43 (2012)).[3]

---

[3] "As a general matter, sufficiency claims are evaluated under [§] 2254(d)(1)." Correa v. Ryan, 216 F. Supp. 3d 193, 196 (D. Mass. 2016) (citing O'Laughlin v. O'Brien, 568 F.3d 287, 298 (1st Cir. 2009)). Here, Petitioner asserts that the SJC's ruling was both an unreasonable application of clearly established federal law, and was based on an unreasonable determination of the facts, but does not further distinguish between § 2254(d)(1) and § 2254(d)(2). "Even were the Court to proceed under [§] 2254(d)(2), . . . this would require evaluating the reasonableness of the state court's factual findings under Jackson v. Virginia, 443 U.S. 307 (1979), which provides the sufficiency standard." Correa, 216 F. Supp. 3d at 197. Accordingly, the Court discerns "no meaningful difference" between the relevant inquiry under § 2254(d)(1) versus § 2254(d)(2) under these circumstances. Id.

B.      Analysis

Petitioner reasserts the same sufficiency challenges that he raised before the SJC. He argues that Soto and Felipe, who were cooperating witnesses, provided "perjurious" and "uncorroborated" testimony that Petitioner was the shooter. Roman, 18 N.E.3d at 1072; [ECF No. 15 at 28]. In his view, the evidence conclusively shows that Felipe was the only person positioned to fire a bullet into the victim's right temple. Roman, 18 N.E.3d at 1072; [ECF No. 15 at 28−29]. Soto testified that he heard only one shot fired in the car before turning around and seeing the victim fall forward; Petitioner claims that this single shot in the car must have been fired into the victim's right temple by the person sitting on the victim's right side—Felipe. Roman, 18 N.E.3d at 1072; [ECF No. 15 at 29]. He similarly describes the DNA evidence admitted at trial as "consistent with [him] being a passenger on [the victim's] immediate left, not [with him being] the shooter." [ECF No. 15 at 31].

Petitioner further relies on the testimony of one witness, Barbara St. Amand, who said that she looked out from her apartment window onto Newton Street and observed a man wearing a black hooded jacket (the type of clothing worn by Felipe) go to the rear passenger's side of a car and pull something out before re-entering the car behind the driver, which then drove away. Roman, 18 N.E.3d at 1072; [ECF No. 15 at 29−30]. St. Amand's testimony, if credited, supports Petitioner's theory that two people were involved in the killing, presumably the driver of the car (Soto) and his rear driver's side passenger (Felipe). Finally, Petitioner emphasizes the absence of evidence of any motive on his part to kill the victim, whereas the jury learned that Angel and Felipe recently had a dispute with the victim over a large outstanding debt, and that the victim told Angel he was going to kill him. Roman, 18 N.E.3d at 1072; [ECF No. 15 at 30].

In sum, Petitioner criticizes the SJC for giving unsatisfactory weight to the evidence in his favor, but "the relevant question is whether, after viewing the evidence in the light most favorable to the *prosecution*, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Housen, 744 F.3d at 222−23 (emphasis added). The petition overlooks the ample evidence corroborating the testimony that after hearing a gunshot, Felipe, Angel, and Soto fled from the car on Essex Street to Sam's Food store, while Petitioner remained with the car and drove it to Sam's Food store. Video footage from a security camera at Essex Street showed that between 2:02:22 a.m. and 2:02:56 a.m., a person from the rear passenger's seat got out of the car and ran toward High Street, followed by a person from the front passenger's side seat, and then the driver. Roman, 18 N.E.3d at 1073. The final person to get out of the car exited from the rear driver's side seat, walked around to the rear passenger's side door, opened it, and leaned inside for about thirteen seconds, before re-entering through the driver's door and driving away. Id. Petitioner does not challenge the seating arrangement in the car as described by the SJC: Soto drove, Angel sat in the front passenger's seat, and seated from left to right in the rear were Petitioner, the victim, and Felipe. Accordingly, the SJC reasonably concluded that the jury could find, based on the video recording and testimony about the seating arrangement, that Felipe, followed by Angel, and then Soto fled from the car toward High Street while Petitioner was the last person to exit the vehicle and eventually drove away in it.

Security camera recordings of Sam's Food store then showed three men arriving at the store between 2:04:02 a.m. and 2:04:17 a.m. Id. The car appeared on camera arriving at the store at 2:04:18 a.m., around the same time that Angel could be seen talking on his cell phone. Id. Telephone records showed that Petitioner called Angel at this same point in time, and that their phones were connected for forty-four seconds. Id. The SJC reasonably determined that the jury

8

could have inferred from the video recordings and telephone records that Angel told Petitioner over the phone to return the car to Sam's Food store where the others were located. It was likewise reasonable for the SJC to conclude that, because only one minute and fifty-six seconds elapsed from the time the car was seen stopped on Essex Street until it arrived at Sam's Food store, there was only enough time for Soto, Angel, Felipe, and the car to converge at Sam's Food store if the events occurred as the prosecution witnesses testified.

Petitioner does not directly challenge the SJC's determinations as to the inferences that the jury could have drawn based on the video footage, telephone records, and the seating arrangement in the car. Rather, he suggests that the Court should have credited St. Amand's testimony that she saw someone matching Felipe's description remove something from the car. As the SJC explained, however, "[t]he jury were not required to accept all of the testimony of a witness," including St. Amand. Id. "[D]etermining a witness's credibility, even in the face of a furious attack, is a function that falls squarely within the province of the jury." Foxworth v. St. Amand, 570 F.3d 414, 427 (1st Cir. 2009) (explaining that the question of whether to accept eyewitness identification testimony is "for the jury to sort out and weigh"). "The actual resolution of the conflicting evidence, the credibility of witnesses, and the plausibility of competing explanations is exactly the task to be performed by a rational jury, considering a case presented by competent counsel on both sides." Id. (quoting Matthews v. Abramajtys, 319 F.3d 780, 790 (6th Cir. 2003)). The habeas court accordingly "resolves all credibility issues in favor of the verdict." Morgan v. Dickhaut, 677 F.3d 39, 47 (1st Cir. 2012). In light of the other testimony and corroborating evidence described above, the testimony of one eyewitness who observed the disposal of something from her apartment window is not a sufficient basis for this

9

Court to find that the SJC's interpretation of the sufficiency of the evidence was objectively unreasonable.

Petitioner next argues that the victim's fatal gunshot wound to the right temple area conclusively proves that Felipe was the shooter, but Petitioner disregards the medical examiner's testimony that the victim sustained three gunshot wounds to the head—two to the left rear side almost on top of one another, and a third wound on the right temple—and that at least one of the left rear-side wounds and the right temple wound were fatal. Roman, 18 N.E.3d at 1075. Petitioner instead emphasizes Felipe and Soto's testimony that they heard only one gunshot in the car, but Soto also testified that after hearing the gunshot in the car he saw the victim fall forward while Petitioner held a small black gun pointed at the victim's head. Id. at 1073. A ballistics expert opined that the gun used to kill the victim was similar to the gun that Soto said that he saw Petitioner holding after he heard a shot. Id. at 1075. That expert further testified that this type of gun is very loud and capable of firing shots in rapid succession, which reasonably explained to the jury how two wounds could be nearly on top of one another and how, due to ringing in their ears, Soto and Felipe were unable to hear two shots fired when they were inside the car. Id.

Soto and Felipe further testified to hearing a second gunshot as they were fleeing to Sam's Food store, and St. Amand similarly thought that she heard two shots. Id. A shell casing that was found in the vicinity of where the car stopped on Essex Street was consistent with a shell being ejected from the gun after Petitioner opened the right rear door of the car and fired one shot into the victim's right temple. Id. at 1075. The victim's DNA matched the single-source DNA profile obtained from a blood stain on Petitioner's right boot, and the major-source DNA profile obtained from the edge of the Petitioner's right jacket pocket. Id. at 1074. Moreover,

transfer stains of human blood were found on the driver's door, the gear shift, the steering wheel, the rear-view mirror, and the emergency brake of the car. Id. The SJC drew a reasonable conclusion that the jury could have rationally inferred that Petitioner transferred the victim's blood to other locations in the car when he exited the vehicle on Essex Street, walked around the car, shot the victim again, and re-entered through the driver-side front door and drove away.

The evidence as a whole—including the video recordings and telephone records; the ballistics, DNA, and medical examiner's evidence; and the testimony that Petitioner was seen holding the gun after a shot was fired and the victim fell forward, and that Soto, Felipe, and Angel fled from the car and heard a second gunshot—provided ample grounds for the SJC to have rejected Petitioner's preferred theory that only one gunshot was fired in the car, and that it must have been fired by the person seated on the victim's right side.[4] The SJC reasonably determined that a rational jury could have found that Petitioner fired two shots at close range into the left temple of the victim, then went around to the other side of the car, opened the rear passenger's side door, and fired a third shot into the victim's right temple.[5] Accordingly, the SJC

---

[4] Petitioner also argues that there was no evidence of motive for him to murder the victim, while Angel and Felipe had previously had an altercation with the victim. Because motive is not an element of the crime of deliberately premeditated murder, the absence of such evidence is insufficient to undermine the SJC's sufficiency determinations in light of the evidence that was presented. Roman, 18 N.E.3d at 1072–73 (citing Commonwealth v. Brooks, 664 N.E.2d 801, 807 (Mass. 1996)). See Commonwealth v. Whitaker, 951 N.E.2d 873, 882 (Mass. 2011) ("Even though there was no evidence of motive, . . . evidence was sufficient to permit the jury to find that the defendant, if only for a moment, reflected on whether to kill [the victim], decided to kill [the victim], and then acted on that decision."); Commonwealth v. Sylvia, 921 N.E.2d 968, 975–76 (Mass. 2010) (prosecutor not required to prove motive to establish first-degree murder on a theory of premeditation); see also Casale v. Fair, 653 F. Supp. 856, 859 (D. Mass. 1987) (because "[m]otive, of course, is not an essential element of a crime" of murder in the second degree, sufficiency challenge failed to warrant habeas relief).

[5] Firing two shots at close range into the back of the victim's head is sufficient to sustain a conviction of deliberately premeditated murder. See Commonwealth v. Coleman, 747 N.E.2d 666, 670 (Mass. 2001) ("[T]he jury could have inferred in these circumstances that the multiple shots fired at the victim were evidence of deliberate premeditation, even if only one shot killed

did not unreasonably apply Jackson or reach an unreasonable determination of the facts in concluding that the Commonwealth proffered sufficient evidence for a rational jury to find that the elements of deliberately premeditated murder were satisfied beyond a reasonable doubt.

## III. CONCLUSION

Based on the facts and supporting evidence, and in light of the high deference to which the SJC is entitled under the AEDPA and Jackson, the petition for a writ of habeas corpus [ECF No. 1] is denied. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to" a habeas petitioner. Rules Governing § 2254 Cases, R. 11(a). Here, because Petitioner has raised genuine, non-frivolous issues of constitutional significance, the Court grants Petitioner a certificate of appealability.

**SO ORDERED.**

September 12, 2018 /s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

---

the victim."); Commonwealth v. Good, 568 N.E.2d 1127, 1131–32 (Mass. 1991) (evidence that defendant, armed with a handgun, left a parked car, approached the victim, and shot him with three bullets at close range was sufficient evidence to support a conviction for deliberately premeditated murder); see also Lao v. Roden, No. 12-cv-11481-NMG, 2014 WL 2767091, at *3 (D. Mass. June 17, 2014) (deliberate premeditation may take place "within a few seconds").